The Supreme Court has repeatedly reaffirmed that the Constitution provides Congress with plenary power to legislate in the field of Indian affairs. In this case, plaintiffs mount a broad and direct challenge to that plenary congressional power. Specifically, plaintiffs assert facial challenges to the constitutionality of the Indian Child Welfare Act of 1978 and to the Interior Department's 2016 rule interpreting the Act. The District Court sustained those challenges. If this Court were to adopt plaintiff's theory for affirming that unprecedented ruling, an entire title of the United States Code would be effectively erased. But that theory and that ruling are wrong, and the judgment of the District Court should be reversed in its entirety. As to the constitutionality of the Act, plaintiffs advance three arguments, asserting violations of equal protection principles, the Tenth Amendment, and the non-delegation doctrine. Let me start with equal protection. The District Court's declaration that the Act impermissibly discriminates on the basis of race should be reversed for two reasons. First, no plaintiff has Article III standing to litigate that issue. And second, the challenge provisions survive the controlling standard of scrutiny. Turning first to standing, it has been black-letter law since the Supreme Court's decision in States to protect her citizens from the operation of federal statutes. The individual plaintiffs have a different disability. Save for only one plaintiff family and with respect to only one of the preferences afforded by Section 1915 of the Act, plaintiffs have failed to show that when the complaint was filed and through the present, the challenge statutory provisions were applied to them or would imminently be applied to them. And even that one preference is independently imposed as a matter of Minnesota law. Additionally and independently, no plaintiff can establish the requisite redressability for Article III standing. That is, success in this federal declaratory judgment action will not redress the injuries alleged to result from application of the Act by state courts. The one family you mentioned earlier. The Cliffords, Your Honor, were subject to one of the four preferences for foster parenting and that's in Section 1915, the little I of the Act. But I'd like to point out in that regard that Minnesota law independently imposes that preference and that's Minnesota Statute Section 260.771, Paragraph 7A, which adopts the preferences in Section 1915. Remind me of the child that the Cliffords are seeking to adopt. What tribe do you know? I believe that is the White Earth Tribe, Your Honor. One of the problems we have in this case is that we do not have a full factual record about these ongoing proceedings for obvious reasons of privacy. And in that regard, the federal defendants asked to do discovery on that issue under Rule 56D and the district court denied that request. But to return to redressability, all parties agree that state courts which apply the Act in numerous individual proceedings are not bound by the judgments of lower federal courts. And so for standing purposes, any declaration by the district court in this case regarding the Act's consistency with equal protection principles would constitute a classic advisory opinion. Well, that wouldn't be true if the White Earth Tribe were a party, would it? Your Honor, not for a party, but of course that... The White Earth Tribe is not a party. White Earth Tribe is not a party to this case. Those are proceedings in... I mean, I think you're overgeneralizing. I mean, if the White Earth Tribe was here, it would seem to me just based on collateral issue preclusion issues that the district court could resolve in this case as between the White Earth Tribe and the Cliffords that one way or another that would be binding on both of them, even in the Minnesota courts. So it's not as broad. I think you're overstating. Your Honor, I think if the White Earth Tribe were a party and we were talking about proceedings in the Minnesota courts, we'd have an abstention problem. You would have an abstention problem. I'm just saying you've overgeneralized your standing issue, it seems to me. I guess what I would come back to, Your Honor, then, is that just in terms of the district courts speaking generally, issuing a declaratory judgment about the act in situations where it's not being applied to individual parties. But that is an advisory opinion and that suffers from the redressability prong or failing to satisfy the redressability prong of Article III standing. As the Supreme Court has explicated numerous times, the classic formulation being in Lujan be defeated as a wildlife. On the merits of the Equal Protection Challenge, the challenge provision should be upheld under And the central issue in this regard is the applicability and continuing viability of that decision. Plaintiffs argue that Mankari is limited to situations in which Congress is regulating either tribal land or tribal self-governance. And plaintiffs further argue that Mankari has been overruled by subsequent Supreme Court decisions. Neither argument is correct. Regarding Mankari's supposed limitations, they are a plaintiff's own devising. In that case, the Supreme Court upheld a Bureau of Indian Affairs employment preference that was granted to Indians not as a discrete racial group, but rather as members of quasi-sovereign tribal entities. That is, the court upheld a preference for members of federally recognized tribes. As an aside, the court may not be familiar with the concept of a federally recognized tribe. It's simply one on the list of 573 tribal entities that are recognized as having a government-to-government relationship with the United States. That list is periodically published by the Bureau of Indian Affairs, most recently last month. And in using the terms member or membership with respect to such a tribe, and those terms are employed both in Mankari and in the Act, I do not want to suggest something like membership in a social club. It is rather membership in a political community, essentially citizenship. This court's decision in Peyote Way Church of God in 1992-1991 is a telling example of a classification that contradicts plaintiff's reading of Mankari. That decision upheld an exemption from the federal drug laws for the non-drug use of Peyote in bona fide religious ceremonies of the Native American Church, or NAC. Relying on Mankari, this court rejected the argument that an exemption for Native American church members, but not for other religiously motivated individuals, violated equal protection. And I quote, we hold that the record conclusively demonstrates that NAC membership is limited to Native American members of federally recognized tribes who have at least 25% Native American ancestry, and therefore represents a political classification, unquote. This classification at issue in Peyote Way Church of God had nothing to do with tribal land, and nothing to do with tribal self-government. NAC is a church, not a tribal governing entity, and not all NAC members even live on reservations. This brings us to whether the Supreme Court has overruled Mankari. It certainly did not do so in Adoran Constructors v. Pena in 1995, which did not even cite Mankari. Nor in Rice v. Cayetano in 2000, which cited Mankari approvingly, and to distinguish it, principally on the ground that the challenge voting restrictions concerned elections of the state of Hawaii, not of a quasi-sovereign Indian tribe. That leaves the adoptive couple decision in 2013, which likewise did not even cite Mankari. Plaintiffs seized on that opinion's suggestion that a certain reading of section 1912 of the act, adopted by the South Carolina courts, but ultimately rejected by the U.S. Supreme Court, would raise equal protection concerns. That suggestion invites us all to take seriously the equal protection issues raised by the act, and certainly the United States does so. But for plaintiffs to read adoptive couple's suggestion of equal protection concerns, an unelaborated reference, to mean that the Supreme Court has implicitly rejected Mankari's application to the act, would be untenable in the extreme. The challenge provisions of the act satisfy Mankari's standard, under which a classification based on membership in a federally recognized Indian tribe must be upheld so long as it quote, can be tied rationally to the fulfillment of Congress's unique obligation toward the Indians, unquote. This is essentially rational basis review for classifications based, that implicate tribal membership. As I will discuss, plaintiffs essentially argue that two provisions of the act fail to meet this rational basis standard of review. Those arguments are unavailing. First, central to the act is its definition of Indian child. In section 1903, paragraph 4, a child meets that definition if he or she is A, a member of an Indian tribe. That prong does not appear to be controversial. A child also meets the definition if he or she is B, the biological child of a member of an Indian tribe, and, the word and is crucial, is quote, eligible for membership in an Indian tribe, unquote. The second prong obviously focuses on membership as well. A child whose Indianness is based solely on race or ancestry does not qualify. The child must be eligible for tribal membership, which is not automatically conferred at birth. To be sure, a child must also have a biological relationship with a tribal member. But this requirement is, in Mankari's phrase, tied rationally to tribal membership itself. As illustrated by sections 1431 and 1433 of Title VIII of the United States Code, which generally confers citizenship on children born abroad of American citizens, the biological in a political community, and so it was eminently rational for Congress to include eligible children. Second, plaintiffs attacked section 1915A's third adoptive preference, which is for placement with, quote, other Indian families, unquote. As an aside, it's again worth emphasizing that no plaintiff has actually encountered this third adoptive preference. Moreover, like all of the preferences in section 1915, it may be overridden for good cause. Plaintiffs argue that this preference is racial because it shows that Congress's true goal was to keep Indians with Indians, not to further a child's relationship with his or her tribe. But that argument is incorrect. The preference is accorded to potential adopters, not who are genetically Indian, but rather because they are members of federally recognized tribes. And section 1903, paragraphs 3 and 8 make that very clear. To summarize the equal protection issue, plaintiffs lack Article III standing to mount an equal court. Moreover, in drawing classifications based on tribal membership, the Act satisfied the applicable standard of scrutiny established by the Supreme Court in Morton v. Mancari. Plaintiffs also challenged the Act as inconsistent with the Tenth Amendment, particularly the anti-commandeering principle recently applied by the Supreme Court in Murphy v. NCAA. But it is not commandeering for Congress to prescribe that state judges must apply federal law, federal statutes otherwise authorized by the Constitution. That is instead preemption, and it is expressly authorized by the Supremacy Clause, with which we are all familiar. Quote, this Constitution and the laws of the United States which shall be made in pursuance thereof shall be the supreme law of the land, and the judges in every state shall be bound thereby. As plaintiffs observed, Murphy explained that preemption under the Supremacy Clause grants Congress the power to regulate individuals, not states. As Murphy put the point, Congress has the power to enact a law that imposes restrictions or confers rights on private actors. That is precisely what Congress did in enacting ICWA. It conferred rights on Indian children, their parents, and Indian tribes, and it imposed correlative restrictions or burdens on potential adopter, prospective adopters, like the individual plaintiffs. Contrary state law is preempted, which is to say that state judges are bound to apply it, notwithstanding any conflicting state law. Commandeering, by contrast, is where Congress tells a state legislature what it must do. Congress has not done that here in ICWA. Or command state executive officers to administer or enforce federal regulatory programs. And Congress has not done that here either. The only two provisions that arguably operate on executive officers are information sharing requirements in Section 1915E and 1951A. And the Supreme Court has not struck down any of those requirements under the Tenth Amendment. Plaintiff's final constitutional argument is that Section 1915C of the Act affects an improper delegation of Congress's legislative authority. But plaintiffs lack Article III standing to challenge that provision as well. It's not directly applicable to states, and it has not been applied or likely to be applied to any of the individuals here. And as we've explained in our brief, this provision is best understood not as a delegation, but as a recognition by Congress of existing legislative authority of tribes. For all these reasons, the Indian Child Welfare Act is constitutional. And we ask that if the Court in some measure concludes otherwise, it should sever the offending provision in accord with the statute's express severability clause in Section 1953. I'd like to speak very briefly to the Interior Department's 2016 rule. Most of the attack... You've saved your time. I'd like to take a minute of my time from rebuttal, Your Honor. Thank you. Most of the criticism of the rule is focused on the fact that Interior supposedly changed its mind between 1979 and 2016. But the Supreme Court has said that agencies may do that if they explain themselves, and the agency did that at pages 38782 through 784 of the Federal Register Notice. And finally, there's the provision of Section 23.132 of the rule, which establishes a good... which speaks to the good cause standard for courts to deviate from preferences. Players say that the Interior Department's discussion of that standard is inconsistent with the Act, but both of those provisions in subsections B and C use the word should, their advice or guidance, not purportedly binding requirements. So we think the rule... We submit the rule is valid, and we urge this Court to reverse the judgment of the District Court. Your Honor. Morning, and may it please the Court. My name is Adam Charnas, and I represent the Cherokee Nation, the Oneida Nation, the Quinault Indian Nation, and the Morongo Band of Mission Indians. In addition, the Navajo Nation is represented at council table by its Assistant Attorney General, Paul Spruhan. The District Court invalidated a 40-year-old federal law that Congress enacted pursuant to its centuries-old trust obligations to American Indians to remedy the tragedy of state and private social workers, removing upwards of one-third of all Indian children from their families, their communities, and their tribes. In seeking an affirmance here, the plaintiffs asked this Court to disregard or misread numerous Supreme Court decisions, cases like Mankari and Holyfield and Lara and Lujan and Prince, as well as this Court's precedent in Peyote Way. Indeed, the expansive holding that they request would rewrite federal Indian law, overturning doctrines accepted in some circumstances for nearly two centuries. This Court should reject those arguments and should reverse the judgment below. Now, Mr. Grant has already discussed standing. What he focused on largely was how the challenge provisions of ICWA are not implicated by any of the individual plaintiffs' circumstances. We agree with those arguments, but like to take a slightly different tack with respect to the individual plaintiffs, and that is that two of the sets of individual plaintiffs simply lack an injury in fact. The Brackeens, the complaint with respect to the Brackeens mentions one child, one child only, ALM. The Second Amendment complaint was filed in March of last year, 2018. ALM was adopted by the Brackeens in January of 2018. They have no continuing injury with respect to ALM. Now, they say that, well, their ICWA permits a collateral attack on their adoption of ALM, and that gives them an injury. But that is far too speculative, as the Supreme Court has repeatedly emphasized in numerous cases, most recently, I think, in the Clapper case, and as this Court has also applied in numerous cases. When you're seeking a prospective remedy, you must show that future injury is certainly impending, and there's no evidence in this record that a collateral attack to ALM's adoption is certainly impending. In fact, the evidence in this record is to the contrary. The child's tribe, the Navajo Nation, has told this Court in its briefs that it will not attack that adoption, and there's no prospects, no indication in the record that anybody else will either. They also, probably recognizing the failure to establish actual injury, injury in fact with respect to ALM, claim that they're attempting to adopt ALM's sister, YRJ, and that establishes standing, because those proceedings are ongoing, apparently ongoing, in Texas State Court. Well, there are two black-letter law principles that tell us that YRJ does not give them an injury, in fact. The first is that standing is determined at the time the complaint is filed. As I mentioned, this complaint was filed in March of last year, and at that time, there was no effort by the Bratkins to adopt YRJ. YRJ is not mentioned in the Second Amendment complaint. So, their efforts months later, apparently to attempt to adopt YRJ, cannot possibly establish injury, in fact, as of March of 2018. The second black-letter rule that shows that YRJ does not give the Bratkins injury, in fact, is that a plaintiff cannot rely on evidence to establish standing that was submitted after final judgment. And all of their evidence about YRJ was submitted after final judgment. The limited evidence in the district court record was submitted by them after the district court entered final judgment, and on appeal, they submitted a blizzard of judicial notice motions, selectively attaching various portions of the record in the ongoing YRJ proceedings. All of that was after final judgment. So, even if it were theoretically relevant somehow to a complaint filed months earlier, it cannot establish standing at this point. So, for these reasons, the Bratkins simply have no injury, in fact. Now, we were told in the plaintiff's, the individual plaintiff's brief that the Libretti's adoption of their child became effective after the final judgment in the district court. And for that reason as well, they have no injury, in fact. Which child is that? I'm sorry. That was the Libretti's child. Right. Yes. Baby O. Now, the Cliffords, even assuming they have some injury, in fact, they lack redressability. Mr. Grant discussed why there's no redressability in a state court in Minnesota with respect to them. I'd also note, however, that they are, like the Bratkins with respect to YRJ, the Cliffords are currently litigating the constitutional question that they are presenting here in state court in Minnesota. And that's really where these claims and these arguments belong. Not in a facial challenge in federal court without a record, but out of factual circumstances, making broad arguments that have nothing to do whatsoever with the provisions of the statute that are actually being applied in their circumstances. State courts are making factual record about the child. Application of ICLA can make determinations of constitutional law as well as a federal court can. Now, the state plaintiffs, in their brief, asserted an equal protection argument as well. They've got several reasons why they cannot do so, or not do so successfully. First of all, the district court did not conclude that the state plaintiffs had standing to assert equal protection claim. Page 3753 of the record is the page of the district court's motion to dismiss order in which the court found the claims, specified the claims, that the state plaintiffs had standing to assert. And the district courts did not list equal protection. Plaintiffs did not cross-appeal that ruling, which would seek to give them broader relief and, therefore, a cross-appeal was required in our view. But even on the merits, as Mr. Grant explained, a state simply has no rights, a state has no rights itself under the equal protection component of the Fifth Amendment and cannot assert claims against a federal statute for a constitutional violation on behalf of its citizens. That is Hornbook law. Even Massachusetts v. EPA, which went a very long way to recognizing state standing in certain circumstances, expressly reaffirmed that the state lacked standing, quote, to protect her citizens from the operation of federal statutes, unquote. And that's exactly the standing that the state plaintiffs seek here with respect to equal protection. Finally, just briefly, the state plaintiffs also lacked standing to make their non-delegation claim. That claim, as you recall, argues that Section 1915C, which allows a tribe to reorder the placement preferences, is an unconstitutional delegation. There is no evidence in this record that the tribe has reordered the placement preferences in a way that has affected even a single child's adoption of a foster care proceedings in any of the three plaintiff states or that such a reordering is certainly impending to affect an actual child in the immediate future. Therefore, their claim is simply speculative, and they have no real and immediate threat of injury that the Supreme Court and this Court have required. Mr. Grant very well presented an overview of the constitutional arguments on the merits that the plaintiffs make here. I'd like to drill down on a couple of different points. With respect to commandeering, as he noted, the Supreme Court has reaffirmed over and over again, in Princeton and New York specifically, that Congress can direct state judges to enforce federal law. Now, the district court didn't directly address or deal with that, those holdings. What the district court held instead, and what the plaintiffs have picked up on here, is an argument that Congress can't modify state law causes of action as applied in state courts. And that seems to be their hook for avoiding the rather obvious Supremacy Clause principle. But that argument is just simply wrong. The Supreme Court, as far back as just after the Civil War in Stewart v. Kahn, held that applicable in state courts. In that case, in states in rebellion when courts were not open, Congress extended statutes of limitations to state law claims. More recently, in Jinx, the Supreme Court upheld under a Tenth Amendment challenge, extensions of state statutes of limitations under the Supplemental Jurisdiction Statute when state claims were brought to federal court and then remanded back to state court. And there are a whole host of cases dealing with federal pay, federal benefits for military personnel, railroad personnel, and so forth, where Congress has adopted pay or benefit statutes that the Supreme Court has held override state community property rules, state divorce rules, and the like. We and other parties cited many of these cases in our briefs and plaintiffs chose to ignore them rather than explain why we were wrong. Now, there are a few provisions of the statute, as Mr. Grant explained, that seem directed not to courts, per se, but to parties. Those are troubling to me, frankly. Right. And I think there are at least three reasons why we think those do not present a constitutional problem. First of all, these are even-handed applications that apply both to state officials and to private officials. That was true in Prince about the gun regulation. That was not true in Prince, with respect, Your Honor. Prince required state, local law enforcement office, local sheriffs and police officers to conduct a background check. Of people who, of people. Activities in which the citizens were participating. That's right. Which is attempted by the end gun. Absolutely. But the commandeering that was challenged was because it required the local law enforcement to do the background check. How is that different from all the things that the local child protective services are required to do? Because the same thing, the myth, I think, or the appearance you get from the plaintiffs' briefs is that only state agencies are involved in these proceedings. And that is simply not true. For example, to take one example, the statute requires before parental rights be terminated that active efforts be undertaken to try and preserve the family, the Indian family. Well, that provision applies, for example, if parents divorce and a step-parent wants to adopt an Indian child and in order to do that you have to terminate the parental rights of one of the parents. Well, the active efforts standard applies to that step-parent adoption, even though there's no state agency involved. And what the Supreme Court has said in a number of cases is that when federal command applies equally to state officials... To me, you're saying that command applies to individuals, not just the state? Yes. So, if you're a step-parent that wants to adopt your step-child, you have to terminate the parental rights of your non-spouse parent, and you have to comply with ICWA as well. So, there are a whole host of ICWA's commands that apply when the state agency is not involved at all. The second reason is, I think that... There are others that clearly just apply to the state agencies. Well, there's some... Can you address those, please? Yes. Well, there's some paperwork requirements, as Mr. Grant mentioned, some reporting requirements. The Supreme Court has never held that information sharing constitutes commandeering, imprints the Supreme Court's... How is that different from background checks? Well, background checks requires an investigation. What ICWA requires... The sheriff has to actually go investigate, determine whether the prospective gun owner has a criminal record, has mental health history that would be disqualifying, and the like. And that's not the case here. For example... Well, they've got to take children into custody. There are waiting periods where they keep the child in custody. Well, that's right. That's a lot more than sharing information. That is true. But I think the way to read the statute is... The best way to read the statute is that the court cannot approve certain actions until those things are done. In other words, the focus really... All those actions that are required by the State agency are required in the context of a pending child welfare proceeding. It seems to me that that applies whether there's a pending action or not. I mean, isn't that correct? No, I don't think that's right, Your Honor. In fact, you know, all these provisions that they challenge as commandeering, you know, the section of the statute that has the most provisions that they challenge as commandeering is section 1912, and section 1912 is called pending court proceedings, and that deals with all the requirements that are required in the context of a pending child welfare proceeding, whether a foster care or adoption proceeding. There are some... The other provisions that they challenge as commandeering, like 1915e and 1917, involve simply information sharing that the Supreme Court has never found particularly problematic. So I don't think it's correct that there are any proceeding, if there are any commandeering provisions, or provisions they allege are commandeering, that occur apart from a pending child welfare proceeding. And so the other point is that they say, well, the statute directly regulates the States in these respects, and to the extent that it's regulating judicial proceedings, as we've argued, that is irrelevant. But what the Supreme Court said in Reno v. Condon is that the Congress can directly regulate the States, right? What Congress can't do is force the State to regulate its citizens, and that's not what it does. But Congress can regulate State activity. In that case, Congress directly regulated what States could do with the driver's license information that they collected. And the Supreme Court, after Prince, after New York, in a unanimous decision by Chief Justice Rehnquist, held that this was simply not a problem at all. That the Federal law that regulated State activities was constitutional as long as it didn't command the States to regulate the private citizens, and that's not what's happening under EFRA. Thank you. Mr. McGill, you're next. Thank you, Judge Dennis, and may it please the Court. Matthew McGill for the individual plaintiffs. My clients opened their hearts and their homes to a child in need and embraced that child as a part of their family. They are here because the Indian Child Welfare Act turned their lives and their families upside down solely because the children they took in were Indian children. The Clifford's family literally was torn apart as Child P was pried away from them, crying uncontrollably. The Brackenes, who are sitting here today, narrowly avoided a similar fate. Even though both of ALM's biological parents supported adoption by the Brackenes, the Family Court judge applying the BIA's new clear and convincing standard of proof ruled against them. Only an emergency stay prevented ALM from being transferred to strangers in New Mexico. In each case here, Indian tribes, to use the Supreme Court's words from adoptive couple, were allowed to play the Iquitrump card to override the child's best interests solely because... Please go through plaintiff by plaintiff and specify exactly what relief you think a federal court can give. Yes, ma'am. Yes, Your Honor. With respect to the Brackenes, the Brackenes have challenged Section 1913, 1914, and 1913 D specifically. A declaration as to... That those statutes, those provisions are unconstitutional would be... Certainly would be... Provide regressibility. It's not binding on anybody. But under this court's decision in Allstate v. Abbott, that is not necessary, Your Honor. In Allstate v. Abbott, that's 495 F. 3rd at 160 and footnote 19. This court said that there would... Regressibility exists where actors who are not parties to the lawsuit could be expected to amend their conduct in response to the court's declaration. In our most recent motion for judicial notice, you'll see the family court order of Judge Kim regarding Child Y.R.J. And he says he is deferring to this court's day. He is looking to this court for guidance. So it makes it at least more likely that the Brackenes would prevail in that case. So regressibility is satisfied under this court's decision in Allstate. I also have to observe that it's a highly unusual argument that an injury caused by an unconstitutional federal statute cannot be regressed by an injunction against the United States. No such injunction has been issued here. That's correct, Your Honor, but we did seek it. And if the United States refused to observe the declaratory judgment, then we could go and seek injunctive relief before the district court. So, you know, their argument that there is no regressibility here turns ultimately on the idea that ICWA, in its very peculiar design, has imposed obligations and is enforced only by state courts and state agencies, which points to the anti-commandeering issue here. I do want to just address a few more of the standing issues here because my colleagues on the other side did spend a lot of time on it. The first point is that the standing arguments here really go only to the equal protection argument, but there's no dispute that all plaintiffs here have standing to challenge the final rule, and we made equal protection arguments against the final rule. So unless you are going to strike down the final rule on the ground that there is no authority for the agency to regulate, and we did make that argument and the district is going to strike down the rule in its entirety on that ground, then you will have to confront the equal protection arguments anyway because we did make them and the court below did rule on them in our favor. The second point is that the Bratkins case concerning ALM, the first child, is not moot. It's harder for me to think of a more appropriate case for the capable of repetition yet evading review exception to the mootness doctrine, where you have a situation where it's not only capable of repetition, it actually is being repeated. It is now being repeated in state court in Texas. It's not merely capable of repetition. It is being repeated. The Bratkins also have challenged, as I mentioned, 1913 and 1914. My colleague representing the tribes said that there is no injury in fact, but this court's decision in Time Warner Cable v. Hudson, 667F3rd at 636, says when a statute positions similar parties unequally before the law, no further showing of suffering based on that unequal positioning is required for purposes of standing. That is the Bratkins situation here. 1913D and 1914 makes their adoption non-final. It is true that there is no actually pending collateral attack, but it is also true that the birth father of ALM could show up any day and mount such a collateral attack within the two-year bar. That's pretty much what happened. If you get an abstinence nationwide injunction, what relief could this court get? Well, 1913 and 1914 applies also in federal court. An injunction of this court would bind lower courts in Texas. That would be some measure of relief. It would not bind the state court, but again, Your Honor, under all state, that is not necessary. Under all state insurance, it's a good case to talk about just a little bit. All state insurance versus Abbott. That's the Attorney General of Texas at the time. It was a statute that created a private right of action against insurance companies, a private right of action to file suit in state court. And all state raised a constitutional argument against the statute, and this court found that there was standing, even though there would be no, a judgment of this court would not bind the state courts that were actually dealing with the state law cause of action that Texas had created. This court held that the injunction against the Attorney General of Texas and the declaration of the statute's unconstitutionality would be good enough. Well, because they can join the Attorney General from enforcing that law. But the statute created only a private right of action, only a private right of action that would be in state court. So, because it created, theoretically, you know, that, in that situation, there would be no binding of the state court. Nevertheless, this court, again, it's footnote 19, because the actors who were not parties to the lawsuit could be expected to amend their conduct. Your Honor, you also mentioned the fact that the Navajo, it's the Navajo Nation that is a party in this lawsuit. The Navajo Nation is opposing the Brackeen's… Actively opposing the adoption of his sister. That is correct. And they would be bound by this court's judgment. So, we think that there is standing here on numerous grounds. I want to now turn to the merits. The other side argues that, essentially, that all tribal classifications under Mancari must be treated as political and given rational basis review. That contention cannot be sustained after Rice v. Cayetano. The Ninth Circuit flatly rejected it in an opinion that included, a panel that included the late Judge Reinhart. And the case is called Kahawaiola v. Norton. We reject the notion that distinctions based on tribal status can never be racial classifications subject to scrutiny. Rice v. Cayetano, they, my colleagues representing the United States, suggested that that case was based only on Hawaii state law. That is wrong. Here is why it is wrong. In Mancari, the United States argued that the classification of Native Hawaiians as relevant there should be sustained under Mancari. I thought it was because the court was dealing with a state and not a tribe. The court was dealing with a state election. That is correct, Your Honor. But the United States, in defending the classification there, which was a classification of Native Hawaiians, the United States argued you should treat this just like the classification of Native Hawaiians. You should treat it, therefore, as political and subject only to rational basis review. That was the United States' argument to the Supreme Court. How did the Supreme Court address that? They did not reject the contention that Native Hawaiians are not an Indian tribe. Instead, the Supreme Court assumed Native Hawaiians were an Indian tribe. And then it said Mancari does not allow a classification of this sort because it involves a critical affair of the state. Rice emphasized that Mancari presented only a limited exception based on the sui generis nature of the BIA's involvement with Indian tribes. The appellants here need you to extend Mancari's limited exception in at least three separate ways. First, even though Rice said we will not extend Mancari to state elections, the appellants ask you to extend Mancari to state court proceedings. Second, even though Mancari has only ever been applied to classifications involving only tribal members, they want you to extend it to this definition of Indian child, which involves not just tribal members, but one generation beyond tribal members, the children of tribal members. And third, they want you to extend Mancari to permit a classification that has in ICWA a manifest racial purpose. This was acknowledged that the federal policy here is to keep Indian children in the Indian community. The government acknowledged that is the federal policy at page five of their opposition to That is miles away from Mancari, where although as the Supreme Court described in Rice, Mancari had undeniably a racial component. But it was political because the BIA has a unique role in governing Indian tribes. And therefore, participation of Indians in the BIA was essentially, to use Mancari's words, allowing the governed participation in the government. That was the tie to Indian self-government that is entirely absent here. This involves state court proceedings, not the internal affair of a quasi-sovereign. It's state court proceedings. Interestingly, ICWA does not apply in tribal proceedings at all. It applies only to state court proceedings. I want to turn now to the anti-commandeering argument. There are two essential arguments that you've heard from the other side. The first is that ICWA represents a valid form of preemption. But as Murphy explains, to be a valid form of preemption, a federal statute must be best read as regulating individuals rather than states. There is no way to read section 1915 and its placement preferences as regulating individuals. It is a direct command to state courts to apply a federal rule of decision in state court cases. There is no way to read that as conferring rights on an individual. And the giveaway, the giveaway is the first line of section 1915A, which says it applies only in cases under state law. If the federal government were creating a federal right, it would apply uniformly. It would apply in tribal court. It would apply in federal court. It wouldn't justify under state law. So 1915 cannot possibly be read as a valid form of preemption under Murphy. The courts don't have any jurisdiction. They don't, but of course, Congress could create federal jurisdiction under their view of the Indian Commerce Clause. Congress could create an entirely parallel. That's kind of a red herring. Well, the tribal court point is not, Your Honor. Well, go ahead. OK. But even if you don't accept that argument, Your Honor, if you read section 1915, it does not read as a regulation of individuals. It reads as a regulation of states. 19 times throughout the relevant provision of the relevant chapter of ICWA, 19 times ICWA tells states, state courts or state agencies what they shall do. This is not a regulation of individuals. This is a regulation of states. And under Murphy, that is not a valid form of preemption. So we come to the second argument, which is that of the tribes, which is that Congress has carte blanche to commandeer state courts. There's no case that supports that proposition. And if it were adopted by this court, it would completely undo the anti-commandeering rule. The result in Murphy could be undone by Congress by a federal statute that requires state court judges to enjoin sports betting activity. There's no... What about foreclosures? Foreclosures? I'm not sure I understand the importance... There are all kinds of federal statutes and regulations that state courts have to follow when they're going to foreclose on someone's home. I understand. So in those... So first of all, in those situations, what Congress has done is have... It does have a valid form of preemption, right? It starts with Congress enacting a federal law that... Congress enacts a federal law pursuant to an Article I power, and that law is supreme in law of the land. But that is not what is going on here, right? What is going on here is the... What's going on here is the imposition of these federal rules of decision on the state courts. But there is no valid form of preemption to back that up. So if Congress validly preempts state law, then yes, of course, state law has to apply it. But if there is no valid preemption to begin with, because you don't have a statute that regulates individuals, well, then your hypothetical would be inact. So in your foreclosure situation, Congress is regulating individuals. It's clearly regulating private actors. The whole idea that the Indians and the federal government have a special relationship and that Congress has a valid role to play in addressing and remediating harms that have been done by breaking up Indian families and not trying to allow them to continue their culture. We can accept that argument, Your Honor, and I could accept that proposition as true, but it would not affect the anti-commandeering analysis. Even if that were a correct description of Congress's Article I power, that would not allow Congress to commandeer. They have to follow the federal law under the Supremacy Clause. So just directing state judges to follow some federal law doesn't mean there's commandeering. That is correct, Your Honor, but it has to be based on a valid exercise of preemption. And that's what's missing here. If there's no valid form of preemption, then there is no law in pursuance of the Constitution that can preempt that under the Supremacy Clause. That is what is missing here. You got that? Yeah, it's the law. And it can preempt in certain situations, can't it? I mean, Congress has the regulatory powers to regulate commerce with the Indians and other... Undeniably, Your Honor, Congress can preempt state law. That is undisputed by us. But the question is, here, is there a valid form of preemption? And this, in 1915... Preemption flows from a federal law. In other words, they have to have the right... If Congress has the right to pass the law, then it's a question of whether it can be preempted or expressly preempted impliedly. So you have to get back to, does Congress have the authority to do this validly? And what Murphy makes very clear is that Congress has the authority only to regulate individuals. It may not regulate states. And you cannot read ICWA's Section 1915 as a regulation of individuals. It can't pass laws that state judges have to enforce because of the Supremacy Clause. That is correct, Judge Dennis, but it has to... Again, to be a valid exercise of power under the Supremacy Clause, it must be an appropriate form of preemption. Section 5 of Murphy should guide this Court's preemption analysis. And our submission is that... Do you concede that the federal government can pass laws and tell the states you cannot permit an Indian child to be adopted and have a list? Now that's a valid exercise of authority. Assuming, putting aside your equal protection argument... Yeah, if Congress passed a straightforward law like that, that said there may be no adoption of an Indian child... Until you've done this, this, and this. I think that would be Congress regulating individuals. That is not what ICWA does. That is our core submission, is that if you read Section 1915, it does not read as a regulation of individuals. If I... You've exceeded your time. May I, Your Honor, just very quickly address the APA argument within one minute? Within 30 seconds. Thank you, Your Honor. If this Court does nothing else, I would urge you to strike down the clear and convincing standard of proof. It is an elbow on the scale that deprives state courts of the ability to do justice in individual cases. The government's argument is only that this is somehow a suggestion. But if you accept our argument that Congress intended a preponderance standard, and that is the lesson of Grogan v. Garner, to which they have no answer, then there is no authority for them to suggest otherwise. Thank you, Your Honor. Thank you, Your Honor. Next is Mr. Kyle Hawkins. Thank you, Judge Dennis. May it please the Court, the federal government may not command states and state officials to carry out a federal regulatory program, yet that is exactly what ICWA does. ICWA commandeers states to implement the federal government's preferred policies contrary to state law. It regulates states, not individuals, and that is impermissible under the Supreme Court's 1997 decision in Prince, the Supreme Court's decision last year in Murphy, and this Court's 1996 decision in Coog v. United States. Before I get into the details, it bears repeating at the outset that our commandeering argument is not about whether ICWA is good policy or bad policy. The commandeering doctrine is about means, not ends. Even if the federal government's policy is laudable and well-intentioned, the federal government must implement that policy itself without conscripting the states. Now, ICWA is the rare statute that commandeers state officials, the state legislative process, and state courts. I'll take each of them in turn. First... What about the spending clause? Real quick. Well, Your Honor, ICWA is not a spending clause statute. The tie-in to the Social Security Act came decades after ICWA was passed. It's true that one of the reasons we have standing is the threatened loss of Social Security Act funding. That's not the only source of standing. Just looking at ICWA on its face, it's not a spending clause statute, and it does not purport to be. What ICWA actually is is a command to state officials and state courts to implement federal policy. I'll start with Section 1912d, which is the most egregious example. It requires state officials to use, quote, active efforts, unquote, to effectuate the federal government's preferred child custody policies, and the states must provide remedial services and rehabilitative programs to effectuate those preferred child custody policies of the federal government. Section 1912e and f require state officials to find, hire, and pay qualified experts to testify as to a child's emotional and physical well-being. Section 1915e requires state officials to maintain records indefinitely and to make those records available for inspection by individuals or tribes, and then there are various notification requirements imposed on states in Sections 1912a and 1951a. The Supreme Court's Prince decision leaves no doubt that this is clear-cut commandeering. Prince involved an act of Congress that required local law enforcement officials to conduct background checks on gun purchasers. Everyone agrees that keeping handguns away from dangerous felons is good policy, and the imposition on local law enforcement officers there was minimal and temporary. It was just a quick background check. But the Supreme Court struck that down because the commandeering doctrine is about means, not ends. The Court explained that the federal government may neither issue directives requiring the states to address particular problems nor command the states' officers or those of their political subdivisions to administer or enforce a federal regulatory program. Such commands, the Court explained, are fundamentally incompatible with our constitutional system of dual sovereignty. It didn't matter that the policy was laudable, and it didn't matter that the imposition was temporary and minor. The same is true here. By ordering state officials to use active efforts, create rehabilitative programs, hire experts, provide various notices... I'm sorry, Judge Jennings, I didn't... I don't believe so, Your Honor. The provision in ICWA telling us... Your Honor, that's an important question because it illustrates the principle that ICWA is about means, not ends. It is indeed possible that there is a constitutional way for the federal government to effect the creation of a rehabilitative program. For instance, it could do so itself via spending clause power or via something else. There may be a constitutional way to do that, but the statute in front of this Court today does not do that. It is unconstitutional because it dragoons the states to do that for the federal government. Setting aside state officials for the moment, ICWA also commandeers the state legislative process. Now, Justice O'Connor's decision for the Supreme Court in New York v. United States and this Court's decision in Coog v. United States squarely hold that Congress cannot effectively bypass the state legislative process and substantively change the enacted policies of state government. Likewise, Murphy, just last year, struck down a congressional statute that commandeered state legislatures by forbidding them to enact certain types of laws. ICWA has all of the same flaws because it rewrites provisions of the Texas Family Code. Let me highlight some examples. First, as to substantive law, Section 162.016 of the Texas Family Code requires courts to look to the best interests of the child. But ICWA, Section 1915b, supplants that and orders state courts to give a placement preference to any Indian over any non-Indian. That is the most clear-cut example of commandeering. ICWA also. ICWA has been around for a long time and it definitely is to protect the culture of Indians. I don't see why you can call that commandeering. They have the authority to pass such laws and to finance them also. Your Honor, we have never disputed that ICWA is well-intentioned. The point of the anti-commandeering doctrine is to limit the means by which Congress can effectuate something. And as I indicated earlier, there may be means to protect Indian culture as Congress wants to do. But what it has actually done violates the Tenth Amendment based on all of these examples I'm providing to the Court today. It is impossible to read Murphy last year and not conclude that ICWA crosses the line into impermissible commandeering. ICWA supplants state procedural rules regarding intervention. If there is an Indian child involved in a proceeding, the tribe gets to intervene automatically regardless of whatever procedural rules a state court might otherwise enforce. ICWA also supplants state evidentiary rules. For example, in a proceeding to terminate parental rights, ICWA orders state courts to apply a beyond-a-reasonable-doubt standard. But for every other proceeding regarding the termination of parental rights in Texas, courts apply a clear and convincing evidence standard. Now, these examples are all contrary to the Court's decision in Coups v. United States, which struck down portions of a federal statute that imposed duties on law enforcement officials. The Court reasoned that those duties were tantamount to forced state legislation. Coups stands for the proposition that Congress cannot bypass the state legislative process and substantively change the enacted policies of state governments. If I change the substantive and procedural and evidentiary law of Texas and the other plaintiff states, that's what ICWA does. Finally, I'd like to document how ICWA directly commandeers state courts to carry out all sorts of administrative tasks in addition to the requirements on state courts to apply federal substantive law. I can't explain why this isn't an example of preemption as to the commandeering. Your Honor, that question is answered by Section 5 of the Court's decision last year in Murphy, and I think it's worth spending some time on Murphy to fully address Your Honor's question. At issue in Murphy was the Professional and Amateur Sports Protection Act. That statute did not outlaw individuals to bet on sporting events. Instead, it directed state legislatures not to legalize sports betting. Now, the parties who are defending that statute argued the same thing that the defendants are arguing here. They said that that statute was garden-variety, run-of-the-mill preemption. The federal government preempts state law all the time, and PASCA, in telling states not to pass these laws, was just basic preemption, ho-hum, nothing to see here. But a seven-justice majority of the Supreme Court rejected that exact argument, and Section 5 of the Murphy decision explains why. Congress can wield its preemption power when it's regulating individuals, not when it's regulating states. That principle was explained more fully by Justice O'Connor's majority opinion in New York of the United States. At the founding, the framers struck a compromise, and that compromise is reflected in the Tenth Amendment. The principle behind that compromise is that the federal government can directly regulate individuals, but it cannot regulate the states, and it cannot regulate the states' regulation of those individuals. It's a rule about means and not ends. Murphy stands for that proposition, and Judge Dennis Murphy's Section 5 answers your question of why this is not preemption. I'd like to address some of the additional arguments that the other side has made. We've spoken about preemption, and I'm happy to speak further on that if the Court has additional questions. Otherwise, I would address the second argument that the other side has made. They say that the commandeering doctrine applies only to state officials and not to state courts. That is wrong, and I'd like to offer two points in response. First, even if that were correct, ICWA is still unlawful because it directly commandeers state officials and the state legislative process for the reasons I documented earlier. Second, the defendant's argument is wrong because it misunderstands Prince and the Testa cases. We, of course, agree that Congress can create a federal cause of action and require that that cause of action be brought and adjudicated in state court. That's Testa, that's Ferg v. Mississippi. But that's not what's happening here. With ICWA, state courts are forced to engage in administrative tasks to carry out a federal program, and they are required to apply federal rules of decision in state family law causes of action. That goes far beyond requiring a state court to simply hear and adjudicate a federal cause of action pursuant to federal rules of decision, which is what the Supreme Court has endorsed. ICWA makes states disregard substantive state law in a state cause of action. I'd like to address the standing argument next. There's been a suggestion that the state plaintiffs lack standing to bring their claims, and that's wrong for several reasons. First, as Mr. McGill indicated earlier, we have brought a challenge under the APA to the final rule. Neither the federal government nor the tribes who are before this court today have challenged in this court that we have standing to challenge the final rule, and we plainly have standing to challenge that final rule. Now, that challenge is predicated on the argument that the final rule must be set aside because it implements an unconstitutional statute. So that puts all of our constitutional arguments before the court and allows the court to address all of them. The standing debate as to those claims is thus entirely academic. The court must address all of them. Even if that weren't true, though, we have standing independent of the final rule to challenge ICWA. First, under the Social Security Act and the implementing regulations, we stand to lose federal funding if we do not affirm our compliance with ICWA and demonstrate what we have done to implement the statute. The relevant sites there are 42 U.S.C. 622A and 45 CFR 1355.34. In addition, we have standing because ICWA offends our quasi-sovereign interests. The Supreme Court has recognized that the protection of our children is among the highest orders of a state's interests. That's the Palmer v. Scidati case. Here, it's our view that children should be treated according to an individualized assessment of their best interests. You used the word your children. Children who live in Texas... They're not your children, necessarily. If they're members of the tribe, they're members of the tribe before they're your children. Your Honor, ICWA applies to children who are not members of a tribe. Those children who are not members of the tribe are residents and citizens of the state of Texas, and it's our view... They're eligible to be. They are eligible for membership in the tribe, but they are not members of the tribe, and that is enough to confirm that we have a quasi-sovereign interest in their well-being. They are our residents, they are our citizens, and in allowing those children to be sent from family to family, pursuant to the labyrinthine structure of ICWA, to ping-pong ball them around, harms those children, in our view, it's contrary to their best interests, and we have a quasi-sovereign interest in suing to stop that from happening. The counsel for the federal government, Mr. Grant, cited the Mellon case to say that we don't have standing to raise these interests, but he neglected to acknowledge page 485 of that decision, which expressly acknowledged the possibility that a state might, in some instances, have standing to protect its citizens against enforcement of unconstitutional acts of Congress. The additional argument the other side has presented that I'd like to address is that the acts of commandeering don't actually matter because they're de minimis. But to say that these impositions are minimal is wrong on the law and on the facts. First, Coog and Prince both foreclosed that argument.  into whether the commandeering rocks the boat in the terms of the court, and in doing so, the Coog case directly split with the Ninth Circuit's decision in the Mack case, which relied on the idea that the commandeering at issue there was too de minimis to matter. In addition, setting aside all of that, the record reflects evidence from Texas Department of Family and Protective Services that in any proceeding implicating ICWA, almost every aspect of the social work and legal case is affected. That's at page 1017 of the record. In this case, the commandeering is even worse because it impacts not only courts, but also state officials. The tribes also argue that ICWA is not commandeering because it applies to all parties equally, and therefore there's no commandeering. That is wrong. The state is the only party that initiates an involuntary termination of parental rights proceedings. That is at 161.003 of the Texas Family Code. So to impose obligations on parties regarding involuntary TPR proceedings is necessarily to impose obligations on state officials and no one else. In addition to that, Section 1912d orders the state to create the remedial and rehabilitative programs that we spoke to earlier. That clearly does not apply to private parties. The creation of remedial programs is something a government does. It's not something that a private couple does seeking to adopt a child. And finally, you don't have to take my word for it. The government, in its preamble to the final rule, concedes that ICWA regulates state officials. The relevant site is 81 Fed Reg 38839. That's the preamble to ICWA, and it says, quote, the language in Section 1915 creates an obligation on state agencies and courts to implement the policy outlined in the statute, end quote. Later on, the preamble goes to say that the active efforts language we discussed earlier is a requirement on state courts and agencies, not private parties. The federal government itself admits that these are directed at state officials, not at private parties. And so the argument that commandeering applies to everyone equally is simply wrong. Finally, in my remaining time, I'd like to step aside from commandeering and focus on the non-delegation argument. Now, the core of our non-delegation claim is that Congress cannot delegate to an Indian tribe the authority to control non-tribal members outside reservations. Yet that is exactly what ICWA does. The defendant's position in this case is literally unprecedented. The Supreme Court has never permitted Congress to give a tribe power to bind actors who are not tribal members outside reservations. A race or a political ruling? Your Honor, the non-delegation argument is neither. It's a directive to Indian tribe. That doesn't play a part in this. No, Your Honor. Our non-delegation argument does not rely on equal protection argument at all. This is an entirely independent argument. Congress has given tribes the power to make law that binds Texas state courts adjudicating proceedings involving children who are not members of that tribe. That is literally unprecedented. Who is it delegated to? Indian tribes, Your Honor. And the relevant section is 1915C of ICWA and then the implementing rule 23.1. Isn't that simply a recognition of powers and customs of? Not at all, Your Honor. Separate tribal entities? Are they sovereign? It is not, Your Honor. It is giving tribes power to bind state courts. The tribes shall establish a different order of preference by resolution, and the state court shall follow such order. If Congress passed a law giving the Mexican government power to regulate divorce proceedings in Orleans Parish, it would be laughed out of court. It would be struck down in an instant as unconstitutional. ICWA is the same in every way that matters. Congress cannot give tribes the power to bind state courts outside reservations dealing with non-tribal members. I see I'm out of time, unless the court has further questions. The Supremacy Clause doesn't see the power there? Contrary to what you say, the Supremacy Clause doesn't enable that to be done? No, Your Honor. The Supremacy Clause does not factor into the non-delegation analysis. Article I prescribes that all powers herein granted by the Constitution are given to the legislature. So legislative power must rest with Congress. Congress can sometimes delegate that power to federal administrative agencies to bind regulated parties pursuant to Whitman versus American Trucking and cases like that. But that is not what's happening here. That analysis doesn't matter. What matters is that they've given a private entity, a tribe, the power to bind the state court. Thank you, Your Honor. Defendant, sir. You have five minutes. Your Honor, I'd like to start with standing. And since we were just talking about non-delegation doctrine, I'll start with that. There's simply no standing for any plaintiff to challenge Section 1915C. The only thing in the record about that preference or about that provision is a single sentence on page 1919 of the Record of Appeal. And that is that the Alabama Cacheta Tribe of Texas has a placement preference on file with the Department of Family Protective Services. That's the only information we have about the application of that preference. There's no way to conclude from this record that that application is certainly impending against any plaintiff, individual, or state. More generally, with respect to standing, and particularly the standing of the states here, Massachusetts v. EPA, and in particular, footnote 17 on page 520 of volume 549 of the U.S. Reports in Massachusetts v. EPA, the Supreme Court reaffirms the validity and continuing vitality of Mellon in challenges like this one, a state trying to seek protection of its citizens against federal statutes. That applies to equal protection and non-delegation. One more point about standing. The Supreme Court's seminal decision in Lujan v. Defenders of Wildlife was itself a challenge to a final agency action. And the very same Article III standing requirements apply to those kind of challenges as to challenges to statutes. And that's at 504 U.S. at 557. On the merits of the continuing application of Mancari, I would direct the Court to page 518 of the Rice v. Cayetano opinion. And there, in a series of statements, the Supreme Court clearly distinguishes the situation in Rice, an election involving the state of Hawaii, a classification involving Native Hawaiians who were not recognized by Congress as an Indian tribe, regardless of what the government might have argued in the case, not recognized, and the Supreme Court distinguishes Mancari on those grounds. On commandeering, my colleague, Mr. McGill, said, ICWA imposes direct commands to state courts to apply federal rules of decisions. That's exactly what preemption is. And I see my time has expired, and I would urge the Court to reverse the judgment of the district court in this case. Thank you very much. Your Honor, counsel pointed to sections 1912 D, E, and F as commanding the actions of state executive branch officials impermissibly. But it's important to look at the actual language of those provisions. 1912 D, E, and F. 1912 D requires active efforts. It says that the party seeking to affect the foster care placement or termination of parental rights shall satisfy the court that active efforts have been made. Subsection E says no foster care placement may be ordered. It doesn't say by the court, but that's what it means. It may be ordered unless certain things are done. And F says no termination of parental rights may be ordered. So all those things are focusing on what a judge does. A judge cannot take certain actions unless certain evidence is presented to him or her. And therefore, it is not a freestanding position on state executive branch officials like Prince was. Counsel also argued that the placement preferences in 1915 A and B do not regulate private parties, but regulate the state. And I think there's sort of two responses to that, which is first, 1915 determines where a child shall be placed, either for adoption purposes in A or for foster care or pre-adoptive placements in B. So it is a regulation of a private individual. It determines where they can be placed for adoptive, pre-adoptive, or foster care placements. Who places them there? The state judge. No, it's not individuals. It's telling the state judge. It's a rule of decision that the state judge must determine in regulating the children, regulating where the child may be placed. That's correct, Your Honor. Plaintiffs seem to be under a misimpression that it is completely impermissible for Congress to regulate the states. And that's not what these commandeering cases say. The commandeering cases say that Congress cannot force the states to regulate the state citizens. Right? So in New York, the Supreme Court said that Congress couldn't force the state legislatures to adopt a law regulating their citizens. That's what Murphy said as well. In Prince, the court said that Congress couldn't force local law enforcement officials, who are state officials, essentially, couldn't force them to conduct these background checks. But in cases like Reno v. Condon, that I mentioned before, and in South Carolina v. Baker, the Supreme Court expressly approved direct congressional regulation of state governments. In Reno v. Condon, Congress regulated what a state government could do with driver's license information, as I explained earlier. And the reason the Supreme Court unanimously, in an opinion by Chief Justice Rehnquist, said that that wasn't commandeering was because the Congress wasn't trying to force the state to regulate its citizens. It said Congress was regulating the state directly. So to the extent that parts of it are regulations of the state, it is constitutional under Reno v. Condon, as the Supreme Court expressly explained, that such regulation of the states is permissible. It had to do with driver's license information? That's correct, Your Honor. And states were being treated just like anybody else who had custody of such information? That's right. One of the two alternative grounds that the Court focused on was that there were private brokers who bought this information from the states, and the statute also regulated them. But the main thrust of the regulation was prohibiting states from profiting by selling the information to the private brokers. You know, counsel briefly mentioned, briefly mentioned the APA argument, and Mr. O'Gill said that the clear and convincing evidence standard was impermissible. It's clear if you read the regulation, the agency expressly says that it is recommending to the states that they adopt the clear and convincing evidence standard, but expressly said they were not requiring it. As a matter of fact, most states, as a matter of state law, have on their own applied a clear and convincing evidence standard and concluded that is most consistent with Congress's intent in adopting ICWA, but plaintiffs never explained how an agency recommendation that is not binding on the states could violate the APA or being consistent with the statute. Thank you. That concludes our arguments for today. We take these cases under advisement, and this panel will recess until 9 AM tomorrow morning here.